DAKOTA INDUSTRIES, INC.,
Appellant/Cross–Appellee,

v.

EVER BEST LTD.; Dakota Blue Corp.;
Carl Eckhaus; Sam Ko; Kenneth
Kwok, Appellees/Cross–Appellants.

Nos. 93–2723, 93–2765.

United States Court of Appeals,
Eighth Circuit.

Submitted March 17, 1994.

Decided July 8, 1994.

James A. Hertz, Sioux Falls, SD, argued, for appellant.

William P. Fuller, Sioux Falls, SD, argued (Gary S. Graifman, on the brief), for appellee.

Before HANSEN, Circuit Judge, HEANEY and JOHN R. GIBSON, Senior Circuit Judges.

JOHN R. GIBSON, Senior Circuit Judge.

Dakota Industries, Inc. appeals from a jury verdict in favor of Ever Best Ltd., Dakota Blue Corporation, Carl Eckhaus, Sam Ko, and Kenneth Kwok in a trademark infringement action. Dakota Industries manufactures cold-weather, outdoor-type garments under the trademark "DAKOTA," and licenses M. Fine & Sons Manufacturing, Inc. to manufacture and sell men's and boys jeanswear under the labels "DAKOTA" and "DAKOTA BLUES." Dakota Blue imports, through Ever Best Ltd., fancy jeanswear from Asia for girls, young men, and young women under the name "DAKOTA BLUE," selling its products in mall shops and lingerie catalogues. After a ten-day jury trial, the jury returned a verdict for Ever Best and Dakota Blue. Dakota Industries filed a motion for a new trial, which the district court denied. Dakota Industries now appeals, raising several issues and requesting a new trial. We reverse and order a new trial because of an error in the court's instructions to the jury.

Dakota Industries received a federal trademark registration for "DAKOTA" in 1972. This trademark was declared "incontestable" by the federal Patent and Trademark Office on August 15, 1978. Dakota Industries filed for Chapter 11 bankruptcy protection in 1987, after experiencing significant declines in its sales and customer base during the 1980s.

In 1989, Dakota Blue began importing, through Ever Best Ltd., a line of women's clothing manufactured in Asia with the label "DAKOTA BLUE." In August 1989, Dakota Industries sought a preliminary injunction to

prohibit Dakota Blue and Ever Best from using the word "DAKOTA." The district court denied Dakota Industries' motion. In 1990, when Dakota Industries learned that Dakota Blue planned to import a line of men's clothing, it sought to enjoin Dakota Blue from expanding into men's clothing. The district court denied Dakota Industries' motion for preliminary injunction, and a panel of this court affirmed. *See Dakota Indus., Inc. v. Ever Best Ltd.,* 944 F.2d 438, 440 (8th Cir.1991). Following a ten-day trial on the merits of Dakota Industries' trademark infringement action, the jury returned verdicts for Dakota Blue, Ever Best, and the individual shareholders.

Dakota Industries appeals, raising numerous issues and arguing, *inter alia,* that the district court: (1) improperly interpreted the incontestability provisions of the Lanham Act, and therefore erred as a matter of law in submitting the issue of ownership of the trademark to the jury; (2) erred in instructing the jury; (3) erred in allowing Dakota Blue to introduce a witness' allegedly false testimony and in allowing counsel to attempt to appeal to sympathy and prejudice during closing argument; (4) improperly allowed counsel for Dakota Blue to disclose the district court's prior rulings regarding Dakota Industries to the jury; and (5) erred in denying Dakota Industries' motion to amend its complaint. Individual shareholders of Dakota Blue, Sam Ko and Kenneth Kwok, cross-appeal, asserting that the court lacked personal jurisdiction over them.

## I.

■ Dakota Industries first argues that the district court erred in interpreting the incontestability provision of the Lanham Act, 15 U.S.C. § 1065 (1988), when it allowed Dakota Blue to challenge Dakota Industries' ownership of the trademark and by submitting the issue of ownership to the jury. Dakota Industries contends that ownership of a trademark is a question of law, and the court committed reversible error by submitting a question of law to the jury for determination.

■ A new trial is required when the district court erroneously submits a question of law to a jury to decide. *Maryland v. Bald-*

*win,* 112 U.S. 490, 493, 5 S.Ct. 278, 279–80, 28 L.Ed. 822 (1884) (if a court commits prejudicial error either in admitting evidence or instructing the jury, the verdict cannot be upheld); *Green Tree Acceptance, Inc. v. Wheeler,* 832 F.2d 116, 118 (8th Cir.1987) ("When a ground for the verdict should have been decided as a matter of law, reversal and a new trial are required in spite of the presence of other grounds to support the verdict."); *E.I. du Pont de Nemours v. Berkely & Co., Inc.,* 620 F.2d 1247, 1257 (8th Cir. 1980) ("If one or more substantial grounds for the verdict presented no jury question and should have been decided as a matter of law ..., reversal and a new trial are required, notwithstanding the presence of other grounds that could have supported the verdict."); *but see id.* at 1258 n. 8 (no new trial where "it is reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it").

The "incontestable ownership" section of the Lanham Act provides:

> To the extent that the right to use the registered mark has become incontestable under section 1065 of this title, the registration shall be *conclusive evidence* of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce ... subject to [certain] defenses.

15 U.S.C. § 1115(b) (emphasis added).

■ Thus, under this provision of the Lanham Act, five years after registering a mark, the registrant may seek to have its mark declared "incontestable." 15 U.S.C. § 1065. Once a mark has become incontestable, its validity is presumed, subject to eight specifically enumerated defenses. *See* 15 U.S.C. § 1115(b)(1)–(8). In other words, the registration of a trademark as incontestable is conclusive evidence of the registrant's exclusive right to use the mark, as well as the registrant's ownership of the trademark, subject to the enumerated defenses. *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 196, 105 S.Ct. 658, 662–63, 83 L.Ed.2d 589 (1985); *Ford Motor Co. v. Sum-*

*mit Motor Prods., Inc.,* 930 F.2d 277, 291 (3d Cir.) (if the trademark has become incontestable, then "validity, legal protectability, and ownership are proved"), *cert. denied,* — U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). The eight defenses in section 1065 of the Lanham Act must be affirmatively pleaded or they will be deemed waived. *Philip Morris, Inc. v. Imperial Tobacco Co.,* 251 F.Supp. 362, 379 (E.D.Va.1965), *aff'd,* 401 F.2d 179 (4th Cir.1968), *cert. denied,* 393 U.S. 1094, 89 S.Ct. 875, 21 L.Ed.2d 784 (1969). If one of the eight defenses is valid, registration for incontestable status falls from "conclusive evidence" of the registrant's right to exclusive use and ownership of the trademark to merely prima facie evidence. *Park 'N Fly,* 469 U.S. at 199 n. 6, 105 S.Ct. at 664 n. 6; *Ford Motor,* 930 F.2d at 291.

Dakota Industries first contends that the court erred in allowing Dakota Blue to challenge its ownership of the "DAKOTA" trademark. Dakota Industries argues that Dakota Blue did not contest Dakota Industries' ownership of the trademark, and therefore, Dakota Industries' ownership should be conclusively presumed. Dakota Blue concedes that it did not contest Dakota Industries' ownership of the trademark in its answer to Dakota Industries' complaint. Dakota Blue did, however, raise two of the enumerated defenses to an incontestable trademark action, laches and abandonment, in its answer to the amended complaint. Dakota Industries moved to strike the affirmative defenses of laches and abandonment and for summary judgment on these defenses. The district court denied the motions, stating that it believed a factual issue remained. The district court also denied Dakota Blue's motion for summary judgment on the ground that Dakota Industries did not own the mark "DAKOTA."

Dakota Blue first raised the ownership issue two weeks before trial in pre-trial motions, and focused considerable time at trial questioning Dakota Industries' ownership. For example, Dakota Blue presented as an exhibit a copy of an agreement in which Dakota Industries gave Brevet International, Inc. a lien on all of the intangible assets of Dakota Industries, including rights in the trademark "DAKOTA." Dakota Blue also called Donald Mackintosh, president of Dakota Industries, to testify about the Brevet agreement. Dakota Blue presented Dakota Industries' bankruptcy petition to the jury, arguing that because Dakota Industries did not list the trademark as part of its assets, it did not own the mark. Finally, in closing arguments, counsel for Dakota Blue again questioned whether Dakota Industries still owned the trademark after pledging it in the Brevet agreement and after filing for bankruptcy protection.

The instructions as originally given did not discuss the issue of ownership. However, a question about the ownership of the trademark was contained in the special interrogatory questions submitted to the jury. The jury did not answer this interrogatory. This special interrogatory allowed the jury to consider the ownership of the trademark, an issue that was irrelevant to the jury's deliberations and decision. In considering and denying post-trial motions, the court recognized: "I don't believe that the ownership issue was handled properly. It really wasn't an issue to start with."

During the course of jury deliberations, however, the jury submitted a question about ownership of the trademark to the court. The jury asked whether Dakota Industries still owned the mark, considering the agreement between Brevet and Dakota Industries which gave Brevet a lien on all intangibles of Dakota Industries, including "all rights to registration."[1] In response to this question, the court gave a written supplemental instruction to the jury that the exhibit in question was not a bill of sale or a transfer of the trademark, but merely a statement by Mackintosh, the president of Dakota Industries. The district court further instructed:

> You should consider all of the evidence in the record in deciding the issue of ownership of the trademark. The factual issue of whether the plaintiff owns the trade-

---

1. The jury inquired: "According to Defendant's Exhibit # 1290, does Dakota Industries really still have the 'Dakota mark' or does Brevet International Inc. of Chicago, Ill." Exhibit 1290 was the agreement between Brevet and Dakota Industries giving Brevet a right to all intangibles.

mark is something you must decide in this case. . . . If you decide that the plaintiff does not own the trademark, then you must return a verdict for the defendants.

This supplemental instruction improperly required the jury to consider and decide the ownership issue. This instruction preempted jury consideration of the likelihood of confusion issue by instructing the jury to return a verdict for Dakota Blue if it decided Dakota Industries did not own the trademark.

Dakota Industries presented proof at trial of the 1978 registration for incontestable status. Thus, the district court should have given an instruction which stated, in essence, that Dakota Industries has incontestable ownership of the trademark, unless the jury found the existence of either laches or abandonment, which are statutorily enumerated defenses. If the jury found Dakota Blue proved one of the statutorily enumerated affirmative defenses, then the incontestable registration is not "conclusive evidence" of Dakota Industries' ownership, but merely prima facie evidence of ownership. If Dakota Blue failed to establish either of the affirmative defenses it raised, Dakota Industries incontestably owns the mark, and then the jury could consider the other issues involved in trademark infringement actions.

In this case, however, the district court did not give instructions that properly submitted these issues to the jury. Instead, in the supplemental instruction given in response to the jury's question during deliberation, the district court gave a general instruction which required the jury to determine the ownership of the trademark. The jury was directed to return a verdict for the defendants if Dakota Industries did not own the trademark. The district court erred when it required the jury to determine ownership.

Because the district court erred as a matter of law in submitting the issue of ownership of an incontestable trademark to the jury, we must order a new trial.

**2.** The district court had previously ruled, and Dakota Blue does not contest, that Dakota Blue had sufficient minimum contacts with South Dakota.

## II.

In light of our reversal and order of a new trial, we need not consider Dakota Industries' arguments of other jury instruction and trial errors. On remand we are confident that the parties will consider the arguments carefully and make every effort to avoid the shoals of trial error.

## III.

■ Finally, individuals Sam Ko and Kenneth Kwok, shareholders in Dakota Blue Corporation who live in Hong Kong, cross-appeal, contending that the district court lacked personal jurisdiction over them. Dakota Industries originally sued Ever Best and Dakota Blue, but moved to join Carl Eckhaus, Ko and Kwok as additional defendants after discovering that Dakota Blue was allegedly a "dummy" corporation set up by the three individuals after they entered a "business arrangement" to design, manufacture and sell garments under the label "DAKOTA BLUE." Dakota Industries argued in its motion that Dakota Blue did not follow proper corporate formalities or organizational requirements and, therefore, the business contacts with the forum state flowed to Eckhaus, Ko and Kwok.[2] Ko and Kwok filed motions to dismiss for lack of personal jurisdiction. The district court denied their motions and held that the corporate veil should be pierced, and the actions of Dakota Blue attributed to Eckhaus,[3] Ko and Kwok, because Dakota Blue was undercapitalized and did not follow corporate formalities.

■ We review a motion to dismiss for lack of personal jurisdiction de novo, and the nonmoving party "need only make a prima facie showing of jurisdiction." *Bell Paper Box, Inc. v. U.S. Kids, Inc.,* 22 F.3d 816, 818 (8th Cir.1994) (quoting *Dakota Indus., Inc. v. Dakota Sportswear, Inc.,* 946 F.2d 1384, 1387 (8th Cir.1991)). The Due Process Clause requires that "minimum contacts" exist between a nonresident defendant and the forum state before the court can exercise jurisdiction over that defendant. *World–Wide*

**3.** Eckhaus does not dispute that he is subject to the court's personal jurisdiction.

*Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). The determination of whether minimum contacts exist is not "one in which [the] answers will be written in 'black and white .'" *Bell Paper,* 22 F.3d at 820 (quoting *Kulko v. California Super. Ct.,* 436 U.S. 84, 92, 98 S.Ct. 1690, 1697, 56 L.Ed.2d 132 (1978) (quoting *Estin v. Estin,* 334 U.S. 541, 545, 68 S.Ct. 1213, 1216, 92 L.Ed. 1561 (1948))).

A federal court may assume jurisdiction over a foreign defendant only to the extent permitted by the forum state's long-arm statute and by the Due Process Clause of the Constitution. *Morris v. Barkbuster, Inc.,* 923 F.2d 1277, 1280 (8th Cir.1991). South Dakota construes its long-arm statute to confer jurisdiction to the fullest extent permitted by the Due Process Clause, *see Austad Co. v. Pennie & Edmonds,* 823 F.2d 223, 225 (8th Cir.1987), so our inquiry addresses only whether the exercise of personal jurisdiction satisfies due process. *See Soo Line R.R. Co. v. Hawker Siddeley Canada, Inc.,* 950 F.2d 526, 528 (8th Cir.1991). "Sufficient contacts exist when an individual's connection with the forum state does not offend traditional notions of fair play and substantial justice and the defendant purposefully avails himself of the privilege of conducting activities within the state, thus invoking the benefits and protections of its laws." *Id.* at 528–29 (citations and internal quotations omitted).

A determination to pierce the corporate veil does not necessarily answer the question of a court's jurisdiction over the individuals behind the veil. Generally, when the corporate veil is pierced, the individuals may be liable for the corporation's actions. *See, e.g., Baatz v. Arrow Bar,* 452 N.W.2d 138, 141 (S.D.1990) (discussing factors relevant to piercing the corporate veil). Whether an individual is subject to the jurisdiction of a federal court is a separate threshold issue, which the district court conflated with the issue of the individuals' liability for corporate actions. The district court should have undertaken a minimum contacts/due process analysis instead of merely piercing the corporate veil. We believe that whether or not the district court was correct in piercing the corporate veil and ruling that the business contacts should flow to the individual shareholders in the corporation, it is clear that Ko and Kwok each benefitted from and controlled Dakota Blue sufficiently to satisfy the minimum contacts test.

Ko and Kwok argue that they do not meet the minimum contacts test for personal jurisdiction because they have never visited South Dakota and own no property there. Kwok, who owns one-third of Dakota Blue, testified that his only personal involvement with the company is inspecting the garments and regularly discussing the business with Eckhaus. Ko testified that he is only a one-third shareholder without any significant role in the "day-to-day operation" of Dakota Blue.

Kwok, a one-third shareholder, inspected the Dakota Blue garments. Numerous memoranda to and from Kwok indicate his extensive personal involvement in running Dakota Blue. Moreover, Kwok's employee designed the "DAKOTA BLUE" labels and tags. Similarly, Ko asserts he was completely uninvolved in Dakota Blue's operation. However, the record reflects he also owned a large part of the corporation, discussed Dakota Blue's expenses with Eckhaus and Kwok, gave advice on pricing the garments, and arranged insurance on ocean freight for exporting the clothing to the United States. Furthermore, Ko's factory manufactured the garments. The minimum contacts required by due process need not include any physical presence in the State. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985); *Bell Paper,* 22 F.3d at 820. A seller in a distribution network that realizes economic benefit from multiple sales in distant fora purposefully avails itself to the fora states' jurisdiction. *Barone v. Rich Bros. Interstate Display Fireworks Co.,* 25 F.3d 610, 612–13 (8th Cir.1994). Kwok and Ko were extensively involved in manufacturing and selling the garments, and reaping the economic benefits flowing from the sales. Thus, we have no hesitation in concluding that they were "purposefully direct[ing] [their] efforts toward residents of the forum state." *Bell Paper,* 22 F.3d at 520.

916

We conclude, therefore, for reasons slightly different from those expressed by the district court, that the district court had personal jurisdiction over Ko and Kwok for purposes of this litigation.

For the foregoing reasons, we affirm the district court's order denying Ko and Kwok's motion for lack of personal jurisdiction, but reverse the district court's judgment and order a new trial.