Judy DELONGA, Plaintiff,

v.

DIOCESE OF SIOUX FALLS; Robert J. Carlson, The Roman Catholic Bishop for the Diocese of Sioux Falls; Fr. Paul V. Dudley, Former Bishop for the Diocese of Sioux Falls; Archdiocese of Milwaukee; the Roman Catholic Bishop for the Archdiocese of Milwaukee; and Father Bruce MacArthur, Defendants.

No. CIV 03–4145.

United States District Court, D. South Dakota, Southern Division.

Feb. 26, 2004.

Charles Rick Johnson, Stephanie E. Pochop, Johnson, Eklund, Nicholson & Peterson, Gregory, SD, Jeffrey R. Anderson, Reinhardt & Anderson, St. Paul, MN, for Plaintiff.

William P. Fuller, Woods, Fuller, Shultz & Smith, Sioux Falls, SD, for Defendant, Diocese of Sioux Falls, Robert J. Carlson, Paul V. Dudley.

David L. Nadolski, Lynn, Jackson, Shultz & Lebrun, Sioux Falls, SD, David P. Muth, John A. Rothstein, Mathew J. Flynn, Quarles & Brady, Milwaukee, WI, May, Adam, Gerdes & Thompson, Pierre, SD, for Defendant, Archdiocese of Milwaukee, Roman Catholic Bishop for The Archdiocese of Milwaukee.

Jeremiah D. Murphy, Murphy, Goldammer & Prendergast, Michael L. Luce, Mark F. Marshall, Davenport, Evans, Hurwitz & Smith, Sioux Falls, SD, for Defendant, Bruce MacArthur.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, a resident of Florida, brought this diversity action based on sexual abuse she suffered as a minor. All of the Defendants have moved pursuant to Fed. R.Civ.P. 12(b) for dismissal of Plaintiff's Complaint. A district court should not grant a motion to dismiss unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts which would

entitle her to relief. *See Conley v. Gibson,* 355 U.S. 41,45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Coleman v. Watt,* 40 F.3d 255, 258 (8th Cir.1994). The complaint is to be construed in the light most favorable to the plaintiff. As a practical matter, a dismissal under Rule 12(b)(6) should be granted only in the unusual case in which a plaintiff has presented allegations that show on the face of the complaint that there is some insuperable bar to relief. *See Coleman,* 40 F.3d at 258. Since the Archdiocese of Milwaukee and the Roman Catholic Bishop for the Archdiocese of Milwaukee have moved to dismiss for lack of personal jurisdiction, however, it is appropriate to consider matters outside the pleadings to determine the relevant jurisdictional facts. *See Stevens v. Redwing,* 146 F.3d 538, 546 (8th Cir.1998). This Court will therefore consider documents outside of the pleadings which have been submitted by Plaintiff and the nonresident Defendants who are contending lack of personal jurisdiction.

Plaintiff alleges in her Complaint that after having been ordained as a Roman Catholic priest in 1953 in the Diocese of Sioux Falls, Defendant Father Bruce MacArthur served as a priest at a number of locations inside and outside the State of South Dakota. She alleges that between 1965 and 1970, MacArthur was on assignment by Bishop Hoch of the Diocese of Sioux Falls to serve as a priest at St. Joseph's Hospital in Beaver Dam, Wisconsin. This assignment was with the permission of Auxiliary Bishop Atkeileski and the then-presiding Archbishop of the Archdiocese of Milwaukee. During his assignment to Wisconsin, MacArthur sexually abused Plaintiff.

In 1963, the Diocese of Sioux Falls was notified that MacArthur, who was then serving as a priest in Platte, South Dakota, was involved in sexual misconduct with a minor. After being notified of the sexual misconduct, Bishop Hoch, who was then Bishop of the Sioux Falls Diocese, discussed sexual abuse of children with MacArthur. After concluding that MacArthur had a problem with sexual misconduct, Bishop Hoch sent MacArthur to Via Coeli, New Mexico, to attend a treatment facility for priests with sexual abusive behaviors. After MacArthur returned from the treatment facility, Bishop Hoch reassigned him to a parish in Ramona, South Dakota. Shortly after this reassignment, Bishop Hoch was again notified of another incident involving MacArthur's sexual misconduct. Instead of alerting law enforcement or preventing MacArthur from serving as a priest, Bishop Hoch again sought to transfer MacArthur to another parish.

In a letter dated February 28, 1965, Bishop Hoch wrote the following to Auxiliary Bishop Atkeileski of the Diocese of Milwaukee:

> During the summer of 1963 I was alerted of [MacArthur's] problem. He told me his story, quite frankly I believed, and I sent him to Via Coeli for some months. Then I reassigned him to another parish and all went well until a few weeks ago when I was alerted to a recurrence of the same problem.

Bishop Hoch asked Auxiliary Bishop Atkeilski "for any help you can give me and Father MacArthur in our present dilemma. If you cannot find a place for him in Milwaukee, I will be also grateful for any suggestion you may care to give me." In early March of 1965, Auxiliary Bishop Atkeilski responded to Bishop Hoch's letter by offering MacArthur a position at the Diocese of Milwaukee's parish of St. Therese. MacArthur was to serve as pastor at both St. Therese and St. Joseph's Hospital. When Bishop Hoch wrote to MacArthur in May of 1965, to advise him of the transfer, Bishop Hoch stated, "I am

sure that you know the situation here [Sioux Falls] better than I and thus you may plan an extended stay in the Archdioces of Milwaukee. I am sure that you will need professional assistance for considerable time."

In the fall of 1965, when Plaintiff was 10 years old, she was hospitalized at St. Joseph's Hospital, where MacArthur was serving as the hospital chaplain, priest and spiritual advisor. Plaintiff was raised in a devout Catholic family, and MacArthur became acquainted with Plaintiff and her family as a result of Plaintiff's hospital stay. MacArthur was subsequently invited to the family home for dinners, birthday celebrations and other special events. From the time of her hospital stay and until 1970,when MacArthur left the Diocese of Milwaukee and returned to the Diocese of Sioux Falls, MacArthur regularly and repeatedly sexually abused Plaintiff.

In April of 1970, the Bishop of the Diocese of Sioux Falls, Bishop Hoch, wrote the following to MacArthur:

My first interest will be to help you. If your problems are behind you, I see no reason why you should not return and be well accepted by both Bishop–Clergy and People. However, if you have any type of mind-set for another locale for your ministry, we shall not make ourselves difficult.

In the summer of 1970, MacArthur invited Plaintiff and some of her friends to visit him in Sioux Falls. During Plaintiff's visit in Sioux Falls, she was again sexually abused by MacArthur.

MacArthur was again transferred and continued to serve as a priest. In February of 1978, MacArthur was indicted in El Paso County in Texas for the attempted rape of a physically disabled patient in a hospital. After MacArthur had completed his incarceration of more than two years on a five-year sentence for attempted sexual assault, Bishop Dudley of the Diocese of Sioux Falls encouraged another transfer of MacArthur. In June of 1981, Bishop Dudley wrote the following to MacArthur:

I am pleased, Bruce, that you are interested in working in the Mexican Missions. I am sure you will make a great contribution. We have two groups of Sisters from Presentation, Aberdeen, who are now serving in different parts of Mexico. It would indeed be an honor for the diocese to have you also serve these beautiful people.

MacArthur was later transferred to Texas and Africa. In July of 1992, Bishop Dudley wrote the following to the Bishop for the Diocese of San Angelo, Texas:

Bishop Michael, in light of our Bishops' Executive Meeting at Notre Dame on the matter of sexual misconduct among clergy, I do believe it is well to keep close and supportive contact with our brother priests who may have had difficulties in the area of sexual misconduct. Due to the incredible increase of litigations and allegations of clergy sexual misconduct in the press, some of the victims of 20 or 30 years ago surface and express their concerns, fears and pain. Just a few days ago, a woman called me expressing such fear and worry that Father Bruce might abuse some child as she was abused.[1]

In August of 1992, Bishop Dudley granted MacArthur's request to retire. On September 15, 2002, MacArthur wrote to Plaintiff and acknowledged his "immoral and grevous (sic) act with you not only

---

1. It is not clear from the record whether Plaintiff is the woman referred to in Bishop Dudley's letter.

because they are contrary to human nature, but also, because, I am a priest and I took you away from Christ the High Priest." ·

Plaintiff brought this action in 2003. In her complaint, she explains:

Circumstances including the nature of the sexual molestation, the trust required of parishioners like Plaintiff and her family by the defendant Dioceses, the power and authority defendant MacArthur asserted over the minor Plaintiff as a result of his position as a Roman Catholic parish priest and the Plaintiff's tender years at the time of the sexual abuse, caused plaintiff to develop various psychological coping mechanisms including developing great guilt, shame, embarrassment, self-blame, denial, repression and dissociation from her experiences. Because of these psychological coping mechanisms, Plaintiff was unable to perceive or know the existence or nature of her psychological injuries and/or their connection to the sexual molestation perpetrated upon her by defendant MacArthur.

In her complaint, Plaintiff alleges one count of sexual abuse against MacArthur, one count of fraud and concealment against the Defendants Dioceses and Bishops, and one count of Negligence against the Defendants Dioceses and Bishops.

## Issue I

### WHETHER THIS COURT HAS PERSONAL JURISDICTION OVER THE ARCHDIOCESE OF MILWAUKEE AND ITS ROMAN CATHOLIC BISHOP?

Defendants Archdiocese of Milwaukee and the Roman Catholic Bishop for the Archdiocese of Milwaukee have moved to dismiss for lack of personal jurisdiction under Rule 12(b)(2). The determination of whether the Court has personal jurisdic-

tion over a defendant is normally a two-step analysis. *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.,* 51 F.3d 1383, 1387 (8th Cir. 1995). First, the applicable state long-arm statute, SDCL § 15-7-2, must be satisfied, and second, the Court's exercise of jurisdiction must comport with due process. *Id.* South Dakota construes its long-arm statute to confer jurisdiction to the fullest extent permitted by the Due Process Clause. *Dakota Industries v. Ever Best Ltd.,* 28 F.3d 910, 915 (8th Cir.1994). As such, the analysis collapses into one step: the due process analysis.

Due process allows a Court to exercise personal jurisdiction over a non-resident defendant only if doing so is consistent with traditional notions of fair play and substantial justice and if the defendant has sufficient "minimum contacts" with the forum state. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95, (1945). The nonresident defendant's conduct and connection with the forum state must be such that he "should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp.,* 444 U.S. at 297, 100 S.Ct. 559.

To evaluate personal jurisdiction under the due process clause, the Court must consider five factors: (1) the nature and quality of the defendants' contacts with South Dakota; (2) the quantity of their contacts with this state; (3) the relation of the cause of action to the contacts; (4) the interest of South Dakota in providing a forum for its residents; and (5) the convenience of the parties. *Burlington Indus., Inc. v. Maples Indus., Inc.,* 97 F.3d 1100, 1102 (8th Cir.1996); *Northrup King Co.,* 51 F.3d at 1387–88; *Land–O–Nod Co. v. Bassett Furniture Indus., Inc.,* 708 F.2d

1338, 1340 (8th Cir.1983). The latter two issues are secondary and of less importance than the first three factors. *Id.* Because the first three factors are closely interrelated, the Court may consider them together. *Id.* The Court should consider the defendants' contacts with the forum in the aggregate; the Court should look at the totality of the circumstances. *Id.* When judging minimum contacts, a court should focus on "the relationship among the defendant, the forum, and the litigation." *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)).

The relationship of the cause of action to the contacts involves a distinction as to whether the jurisdiction is specific or general. *EFCO Corp. v. Aluma Sys., USA, Inc.,* 983 F.Supp. 816, 820 (S.D.Iowa 1997). " 'Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state,' while '[g]eneral jurisdiction ... refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose.' " *Bell Paper Box, Inc. v. U.S. Kids, Inc.,* 22 F.3d 816, 819 (8th Cir.1994) (quoting *Son-*

*dergard v. Miles, Inc.,* 985 F.2d 1389, 1392 (8th Cir.1993)); *See also Burlington Indus., Inc.,* 97 F.3d at 1102–03. The case at hand involves specific jurisdiction. When the Court considers whether it has specific jurisdiction over nonresident defendants, due process is satisfied if the defendants purposefully directed their activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities. *Wessels, Arnold & Henderson v. National Med. Waste, Inc.,* 65 F.3d 1427, 1432 (8th Cir. 1995).[2]

The basis of the Plaintiff's case is that the Plaintiff was injured because the Dioceses of Sioux Falls and Milwaukee agreed to move a South Dakota pedophile priest to Milwaukee without warning or otherwise protecting foreseeable victims. Plaintiff further contends that after the Diocese of Milwaukee harbored the known pedophile priest, he was sent back to South Dakota where he again victimized the Plaintiff, this time in South Dakota. In a supplemental brief, Plaintiff relies on the case of *The Archdiocese of Milwaukee v. Superior Court of Orange County,* 112 Cal.App.4th 423, 5 Cal.Rptr.3d 154 (2003)(review denied Jan. 14, 2004)[3], in contending that personal jurisdiction is fair and reasonable under all of the circum-

**2.** Defendants Archdiocese of Milwaukee and the Roman Catholic Bishop for the Archdiocese of Milwaukee rely on their chancellor's declaration which maintains that these defendants do not own, use or possess property within South Dakota, do not transact business in South Dakota, and have no physical presence in South Dakota. However, the minimum contacts required by due process do not require a physical presence in the State. *Dakota Industries v. Ever Best Ltd.,* 28 F.3d at 915. Many of the Defendants arguments are addressed by *Keeton v. Hustler Magazine,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). Furthermore, neither the fact that a Plaintiff does not have minimum contacts with the forum state nor the fact that the

Plaintiff chose a form with an unusually long statute of limitations defeats jurisdiction otherwise proper under the long-arm statute and Due Process Clause. *Keeton v. Hustler Magazine,* 465 U.S. 770, 779, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).

**3.** The Defendants have moved to strike Plaintiff's supplemental brief. The California case which is presented in the supplemental brief was decided on October 1, 2003, so this Court finds it both reasonable and desirable that Plaintiff would direct the Court's attention to the case in a supplemental brief. As a result, the Court is denying the motion to strike.

stances of this case. In this California case, the Archdiocese of Wisconsin sent a pedophile priest to California, where the pedophile priest began molesting the plaintiff when the plaintiff was eight years old. The Archdiocese knew that the pedophile priest had been convicted in Wisconsin of sexual perversion with a minor boy, and knew that the priest had engaged in other sexual conduct with minors. The plaintiff brought an action in California against the Orange Diocese in California, the Archdiocese of Wisconsin, and the priest.

In denying the Archdiocese of Milwaukee's motion to quash service for lack of personal jurisdiction, the California trial court concluded that the evidence was sufficient to show that the Archdiocese "chose to place this troublesome member of its clergy here in California as a sort of lend-lease program with the hope that he would be out of their sight and out of their jurisdiction." 112 Cal.App.4th at 434, 5 Cal.Rptr.3d at 164. The Court of Appeal held that the evidence supported that conclusion. The Court of Appeal further concluded that the Archdiocese of Milwaukee established minimum contacts with California and that those contacts were substantially related to the plaintiff's claims. In concluding that the assertion of specific jurisdiction was fair, the Court of Appeal observed that Wisconsin and California had a shared interest in furthering the social policy of protecting children from sexual abuse, and that the social policy was furthered by asserting jurisdiction over the Milwaukee Archdiocese in California. 112 Cal.App.4th at 443, 5 Cal.Rptr.3d at 171.

Defendants Archdiocese of Milwaukee and its Bishop cite *Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558 (8th Cir.2003), as support for its position that this Court should decline to exercise personal jurisdiction over them. In the *Pecoraro* case, the plaintiff, a resident of Nebraska, was sent to Sky Ranch for Boys, Inc., (Sky Ranch) in South Dakota, where he was sexually abused by a priest who was the director of Sky Ranch. The Plaintiff filed a diversity suit in the District of Nebraska against the priest, Sky Ranch, the foundation responsible for fund raising and public relations for Sky Ranch, and the Diocese of Rapid City in South Dakota. The plaintiff alleged in his complaint that he had been sexually assaulted twice in South Dakota and once in Chicago. The district court granted the defendants' motion to dismiss for lack of personal jurisdiction. The Eighth Circuit reversed with regard to all of the defendants but the Diocese of Rapid City. The Eighth Circuit observed: "Pecoraro has not made any showing of minimum contacts between the Diocese and the State of Nebraska. He appears to argue that, because of the Bishop's role as a director and officer in the Sky Ranch corporation Sky Ranch's contacts should be imputed to the Diocese."[4] *Id.* at 562. The Eight Circuit explained that the potential for vicarious liability is irrelevant to the issue of personal jurisdiction. The Plaintiff in this case, however, asserts a more substantial basis by which it contends this Court may properly exercise personal jurisdiction over the Archdiocese of Milwaukee.

The Archdiocese of Milwaukee and its Bishop also contend that their contacts

4. Pecoraro alleged that the priest had flown the Sky Ranch airplane into Nebraska, kidnaped him, and taken him to Wyoming. Pecoraro also alleged that the priest, acting as the director of Sky Ranch, represented to Nebraska authorities that Sky Ranch had been closed for financial reasons when it had actually been closed because of allegations against the priest. The foundation had held two fund-raising events in Nebraska during the period in which Pecoraro's cause of action arose.

with the State of South Dakota are more tenuous than the contacts that the nonresident Diocese had with New Mexico in a case where the Court of Appeals of New Mexico declined to exercise personal jurisdiction over the nonresident Diocese in *Doe v. Roman Catholic Diocese of Boise, Inc.*, 121 N.M. 738, 918 P.2d 17 (1996). In that case the Boise Diocese gave a priest permission to leave Idaho to find an assignment in another Diocese in the Southwest, the priest selected New Mexico from among several other possible destinations, and subsequently the priest allegedly sexually abused the plaintiff. There was no evidence that the Boise Diocese played any role in the priest's decision to come to New Mexico. *Id.* at 23. This Court disagrees with the characterization of the contacts between the Boise Diocese and New Mexico in the *Doe* case as being less tenuous than the contacts between the Archdiocese of Milwaukee and South Dakota in the case at hand. In viewing the complaint and evidence in the light most favorable to the plaintiff, the case at hand presents a situation in which the Archdiocese of Milwaukee agreed with the Diocese of Sioux Falls to "find a place" for a South Dakota priest that both knew had a history of sexually abusing children in South Dakota. By doing so, the Archdiocese of Milwaukee arguably aided and abetted the sexual abuse by harboring MacArthur and concealing his crimes from authorities who would have responded more aggressively to the sexual abuse than did the Diocese of Sioux Falls. Furthermore, the Archdiocese of Milwaukee failed to advise the South Dakota authorities of MacArthur's crimes before MacArthur returned to South Dakota and later abused Plaintiff in South Dakota.

A plaintiff need only make a prima facie showing of personal jurisdiction over a defendant to survive a motion to dismiss for lack of personal jurisdiction. Plaintiff has made such a showing. Jurisdiction over these nonresident defendants is appropriate based on "the relationship among the defendant, the forum, and the litigation." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. at 775, 104 S.Ct. 1473. Exercising personal jurisdiction over these nonresident defendants is certainly fair in light of South Dakota's interest in not having persons who have sexually abused children within this State harbored outside this State until they return, without warning of their danger, to again prey upon the children within South Dakota's borders. Nonresident defendants who play a knowing role in the scenario alleged by Plaintiff should reasonably anticipate being haled into court in South Dakota. For these reasons, the motion to dismiss for lack of personal jurisdiction is denied.

### Issue II

## WHETHER THE WISCONSIN OR SOUTH DAKOTA STATUTE OF LIMITATIONS APPLIES TO THE WISCONSIN DEFENDANTS?

■ The Wisconsin Defendants cite *ABB–Daimler–Benz Transp.(North America), Inc. v. National Railroad Passenger Corp.*, 14 F.Supp.2d 75 (D.D.C.1998), and *Boxer v. Gottlieb*, 652 F.Supp. 1056 (S.D.N.Y.1987), for the proposition that in cases involving multiple defendants, the Court should conduct a different choice of law analysis for each defendant. These Defendants contend that the Wisconsin, rather than the South Dakota, statute of limitations should apply to the claims against them.

The federal courts apply the choice of law rules of the forum state. *Corsica Coop. Ass'n v. Behlen Manufacturing Co., Inc.*, 967 F.Supp. 382 (D.S.D.1997). South Dakota follows the Restatement of Conflicts (Second) in applying the most significant relationship approach for deciding

choice of law in multistate tort conflicts. *Chambers v. Dakotah Charter, Inc.,* 488 N.W.2d 63 (S.D.1992). The factors in determining the most significant relationship include the relevant policies of the forum and the basic policies underlying the particular field of law. *Id.* at 68. Based on these factors, this Court believes application of South Dakota law is appropriate.

However, even if the Court were to determine that Wisconsin law would apply to the Wisconsin defendants, Wisconsin law, as set forth in Wis. Stat. § 893.15(2), requires application of the statute of limitations of the local law of the forum. Wis. Stat. § 893.15(2) states: " In a non-Wisconsin forum, the time of commencement or final disposition of an action is determined by the local law of the forum." Based on the requirement of Wis. Stat. § 893.15(2), the district court for the Eastern District of Michigan, in a sex abuse case involving Wisconsin clergy, determined that the choice of law issue must be resolved to require application of the Michigan statute of limitations. *See Isley v. Capuchin Province,* 878 F.Supp. 1021, 1026 (E.D.Mich.1995). In the case at hand, the choice of law issue must be resolved by applying the South Dakota statute of limitations.

### Issue III

### WHETHER PLAINTIFF'S CLAIMS ARE TIME BARRED?

■ The Defendants contend that Plaintiffs claims are time barred. In *Stratmeyer v. Stratmeyer,* 567 N.W.2d 220 (S.D. 1997), the South Dakota Supreme Court held that the discovery statute of limitation in S.D.C.L. § 26–10–25, which was enacted in 1991, applied retroactively to child sex abuse which occurred before the passage of the statute. S.D.C.L. § 26–10–25 provides:

> Any civil action based on intentional conduct brought by any person for recovery of damages for injury suffered as a result of childhood sexual abuse shall be commenced within three years of the act alleged to have caused the injury or condition, or three years of the time the victim discovered or reasonably should have discovered that the injury or condition was caused by the act, whichever period expires later.

The Defendants maintain that the South Dakota Supreme Court in *Stratmeyer* overlooked case law which provides that a state legislature may not enact a statute that retroactively revives a cause of action already barred by the statute of limitations. *See State of Minnesota, ex rel., Hove v. Doese,* 501 N.W.2d 366, 370 (S.D. 1993); *State, By and Through Dept. of Social Services, ex rel., Dotson v. Serr,* 506 N.W.2d 421, 423 (S.D.1993). In support of their position, the Defendants rely on *Gross v. Weber,* 112 F.Supp.2d 923, 926(D.S.D.2000)("The Stratmeyer decision did not address the South Dakota Supreme Court's decisions holding that the legislature did not have the authority to revive a dead cause of action.").[5] Although the Supreme Court may not have addressed the earlier cases prohibiting the revival of paternity actions which had been barred by the paternity statute of limitations before modification of that statute of limitations, this Court does not conclude that the South Dakota Supreme Court was unmindful of that case law. The South Dakota Supreme Court in *Koenig v. Lam-*

---

5. When the Eighth Circuit affirmed the district court's earlier dismissal in *Gross v. Weber,* it based its holding on the absence of clear Congressional intent to retroactively apply the provisions in the Violence Against Women Act and Title IX. 186 F.3d 1089, 1091 (8th Cir. 1999). The Eighth Circuit did not conclude that S.D.C.L. § 26–10–25 was applicable to the federal causes of action presented on appeal. *Id.* at 1092 n. 5.

*bert*, 527 N.W.2d 903, 905 (S.D.1995), relied, in substantial part, upon *State of Minnesota, ex rel., Hove v. Doese* as support for its holding that S.D.C.L. § 26–10–25 could not be applied retroactively. The South Dakota Supreme Court in *Stratmeyer* very clearly abrogated its decision in *Koenig*. 567 N.W.2d at 224 n. 10. By so doing, the South Dakota Supreme Court rejected the contention that the underlying authority for the *Koenig* decision was controlling on the issue of retroactive application of S.D.C.L. § 26–10–25.

In the *Stratmeyer* decision the South Dakota Supreme Court justifiably concluded there was clear legislative intent to apply S.D.C.L. § 26–10–25 retroactively. S.D.C.L. § 26–10–25 through 29 were passed as a whole. S.D.C.L. § 26–10–29 defined "childhood sexual abuse" as the term is used in S.D.C.L. § 26–10–25, in part, as an act "which would have been a violation of SDCL ch. 22–22 or prior laws of similar effect at the time the act was committed." Chapter 22–22 of the Code was enacted in 1967. The South Dakota Supreme Court reasoned that if the Legislature had not intended retroactive application of S.D.C.L. § 26–10–25, it would not have defined "childhood sexual abuse" by reference to SDCL ch. 22–22 or prior laws of similar effect. 567 N.W.2d at 223–224.

The Defendants contend that retroactive application of S.D.C.L. § 26–10–25 interferes with their vested rights and violates due process. The United States Supreme Court, however, has not regarded the shelter afforded by a statute of limitations as a vested fundamental right. As the Supreme Court has explained:

Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witness have died or disappeared, and evidence has been lost.... They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate. Their shelter has never been regarded as what now is called a 'fundamental' right or what used to be called a 'natural' right of the individual. He may, of course, have the protection of the policy while it exists, but the history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control.

*Chase Securities Corp. v. Donaldson*, 325 U.S. 304, 314, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945) (citation omitted); *See also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 229, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995).

The Court of Appeals of Minnesota has held that a discovery limitations statute for sexual abuse applies merely to a party's remedy, and as such, does not create a vested right in the defendants. *K.E. v. Hoffman*, 452 N.W.2d 509, 513 (1990). The Court of Appeals concluded that there could be no just and reasonable reliance on a shorter statute of limitations in the context of child sexual abuse. *Id.* In addition, the Court of Appeals reasoned that since the statute had a reasonable relation to the state's legitimate goal of affording a remedy to sexual abuse victims, the statute did not violate due process. *Id.* at 514. This Court finds the above reasoning persuasive.

Because childhood sexual abuse litigation is of relatively recent origin, the Legislature most likely had not contemplated

the causes of action in the case at hand at the time the general personal injury statute of limitations in S.D.C.L. § 15–2–14(3) was enacted. At that time, the Legislature most certainly was unaware of the involuntary coping mechanisms associated with victims of sexual abuse which may hinder such victims from making the causal connection between their abuse and problems suffered later in life. It is difficult to contemplate a vested right in a legislative shelter from a cause of action when that cause of action was most likely never adequately considered by the Legislature. For this additional reason, this Court finds particularly unpersuasive Defendants' claim to a vested right in the shorter personal injury statute of limitations.

■ Defendants also maintain that application of the discovery statute of limitations violates the *Ex Post Facto* Clause of Art. 1, § 10 of the Constitution. In support of their position, Defendants cite *Stogner v. California*, 539 U.S. 607, 123 S.Ct. 2446, 156 L.Ed.2d 544 (2003). In the *Stogner* case, a criminal defendant challenged a California law permitting criminal prosecution for sex-related child abuse where the prior limitations period had expired if the prosecution were to begin within one year of a victim's report to police. The United States Supreme Court, in a 5–4 decision, held that the law violated the *Ex Post Facto* Clause when it was applied to revive previously time-barred prosecutions. Defendants contend that the holding in *Stogner* applies in a civil action such as the one at hand.

The majority opinion in *Stogner*, however, recognized a distinction between a civil statute and criminal statute in discussing considerations of the *Ex Post Facto* Clause. *Id.* at 2454, 2460. Also, the Supreme Court has defined a violation of the *Ex Post Facto* Clause in relation to the criminal law. *See Collins v. Youngblood*, 497 U.S. 37, 42, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990).[6] The Supreme Court has held that the *Ex Post Facto* Clause applies only to punitive statutes. *Galvan v. Press*, 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954)(Court declines to extend *Ex Post Facto* Clause to deportation proceedings). In addition, the Eighth Circuit has held that the Ex Post Facto Clause is inapplicable to a civil statute because the *Ex Post Facto* Clause extends only to criminal statutes. *See Yaffe Iron & Metal Corp. v. United States*, 593 F.2d 832, 837 (8th Cir.1979); *See also Adams v. State*, 428 So.2d 117, 119 (Ala.Civ.App.1983). The *Ex Post Facto* Clause does not apply to South Dakota's discovery statute of limitations in a civil action for child sexual abuse.

Issue IV

## WHETHER THE DISCOVERY STATUTE OF LIMITATIONS FOR SEXUAL ABUSE APPLIES ONLY TO INTENTIONAL ACTS OF THE PERPETRATOR?

■ The discovery statute of limitations in S.D.C.L. § 26–10–25 applies to "[a]ny civil action based on intentional conduct brought by any person for damages for injury suffered as a result of childhood sexual abuse." S.D.C.L § 26–10–29 defines childhood sexual abuse as "acts committed by the defendant against the complainant who was less than eighteen years of age at the time of the act and which act

---

**6.** A law violates the *Ex Post Facto* Clause only if it: 1. Punishes as a crime an act previously committed, which was innocent when done; 2. Makes more burdensome the punishment for a crime after its commission; or 3. De-

prives a person charged with a crime of any defense available under the law in effect at the time the act was committed. *Collins v. Youngblood*, 497 U.S. 37, 42, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990).

would have been a violation of chapter 22–22 or prior laws of similar effect at the time the act was committed which act would have constituted a felony." The Defendants contend that if S.D.C.L. § 26–10–25 applies retroactively to acts which occurred before its passage, it still applies only to the intentional acts of MacArthur. The Defendants rely on case law from California, Colorado and Rhode Island to support their position that the general personal injury statute of limitations, rather than the discovery statute of limitations for childhood sexual abuse, applies to non-perpetrator-defendants. *See Sandoval v. Archdiocese of Denver*, 8 P.3d 598, 601 (Colo.App.2000); *Kelly v. Marcantonio*, 678 A.2d 873, 877 (R.I.1996); *Debbie Reynolds Prof. Rehearsal Studios v. Superior Court*, 25 Cal.App.4th 222, 232, 30 Cal. Rptr.2d 514, 519 (1994)(holding later abrogated by amendment to Cal.Civ.Proc.Code § 340.1(A)(2) (West 1999)). This Court, however, finds more persuasive the reasoning employed by the courts in other jurisdictions with similar statutes of limitations who have applied such statutes uniformly without distinguishing between perpetrators of sexual abuse and allegedly negligent defendants.

In *C.J.C v. Corporation of the Catholic Bishop of Yakima*, 138 Wash.2d 699, 985 P.2d 262 (1999), the Supreme Court of Washington construed a discovery statute of limitations which applied to "[a]ll claims or causes of action based on intentional conduct brought by any person for recovery of damages for injury suffered as a result of childhood sexual abuse." In *Werre v. David*, 275 Mont. 376, 913 P.2d 625 (1996), the Supreme Court of Montana construed a discovery statute of limitations which applied to "[a]n action based on intentional conduct brought by a person for recovery of damages for injury suffered as a result of childhood sexual abuse." Both the Supreme Court of Wash-

ington and the Supreme Court of Montana concluded that under the plain meaning of "based on," their respective statute of limitations applied if intentional sexual abuse was the starting point or foundation of the claim, and that such statute of limitations was not limited to intentional tort actions against perpetrators of childhood sexual abuse. *C.J.C.*, 138 Wash.2d at 709, 985 P.2d at 267 (citing Webster's Third New International Dictionary 180 (1986)); *Werre*, 275 Mont. at 385–387, 913 P.2d at 631–632.

In *Almonte v. New York Medical College*, 851 F.Supp. 34 (D.Conn.1994), The United States District Court for Connecticut construed the Connecticut statute which provided that "no action to recover damages for personal injury to a minor, including emotional distress, caused by sexual abuse" could be brought later than seventeen years after the plaintiff would reach majority. In applying the statute to negligence claims, the district court explained that the statute does not limit its application to particular offenders, but focuses on actions flowing from a particular type of harm. *Id.* at 37. The district court also observed:

> In recognizing that it may take years for a victim to come to terms with the sexual abuse, the Legislature implicitly understood that it may take as much time to identify those responsible for the abuse: It is only logical that the abuse and the abuser must be identified before the chain of responsibility can be discovered. Thus were the [Connecticut sex abuse statute of limitations] limited to actions against perpetrators only, many if not most non-offender prospective defendants would, for all practical purposes, be rendered immune to suit. Such a result is both contrary to public policy and inconsistent with the Legislature's intent to broaden the remedies

available to victims of sexual abuse through the extended limitations period. *Id.* at 37–38.

In construing S.D.C.L. § 26–10–25, this Court will abide by the principle that words and phases in a statute must be given their plain meaning and effect, and this Court will not ignore the dictionary definition of the statute's "based on" language. *See Pete Lien & Sons, Inc. v. City of Pierre,* 577 N.W.2d 330 (S.D.1998); *M.B v. Konenkamp,* 523 N.W.2d 94 (S.D.1994). One of the cases relied upon by the Defendants, *Sandoval v. Archdiocese of Denver,* 8 P.3d 598, 601 (Colo.App.2000), acknowledged the literal meaning of "based on," and the plausibility of concluding that the phrase "any civil action based on a sexual offense" includes a cause of action for negligence. In ultimately rejecting such an interpretation, however, the Colorado Court of Appeals relied, in part, on a legislative history which included a focus of debate on the perpetrator of sexual abuse and a rejection of a specific proposal to refer to a civil action for negligence in the Colorado statute of limitations. *Id.* at 604. The Court is not aware of, and the parties have not contended, that such a legislative history accompanied the passage of S.D.C.L. § 26–10–25. Had the Legislature intended to restrict the statute to actions against perpetrators of sexual abuse, it could have, and presumably would have, restricted the application of the statute to "any action against the perpetrator of child sexual abuse."

The focus of the statute at hand, as gleaned from its language, is on actions flowing from a particular type of harm, not on the nature of the party or parties causing the harm. This Court agrees with the South Dakota Supreme Court's determination that the South Dakota Legislature "decided that special protection was necessary for vindication of victims of sexual abuse" for acts that occurred in the past as well as those that occurred in the future. It is consistent with that legislative decision to provide protection for victims of sexual abuse that the discovery statute of limitations not be interpreted so as to render most non-offender defendants immune from suit. Accordingly, the discovery statute of limitations in S.D.C.L. § 26–10–25 applies to all the Defendants in all of Plaintiff's causes of action.

### Issue V

### WHETHER THE PLAINTIFF IS BARRED FROM RELYING ON THE THEORY OF FRAUDULENT CONCEALMENT?

Plaintiff contended that even if the statute of limitations in S.D.C.L. § 26–10–25 applied only to MacArthur, the general personal injury statute of limitations was tolled due to fraudulent concealment. The Defendants contend that although the South Dakota Supreme Court has acknowledged that the general personal injury statute of limitations could be tolled under a fraudulent concealment theory in *Koenig v. Lambert,* 527 N.W.2d 903 (S.D. 1995), the facts in that case showed that the defendants had knowledge that the plaintiff was being abused by a priest under their direction and control. Defendants contend that in this case, the Dioceses knew only that MacArthur had abused others, and that they lacked the specific knowledge that MacArthur was sexually abusing Plaintiff. These Defendants further contend that in order to constitute fraudulent concealment, the Defendants' actions must have been directed toward preventing Plaintiff from discovering her cause of action.

While the Defendants may ultimately prevail on their argument concerning fraudulent concealment, this Court must now consider the argument within the confines of a motion to dismiss. Plaintiff al-

leges in her complaint that despite her exercise of due diligence, she was prevented from discovering her causes of action because of the Defendants Dioceses' fraudulent concealment and representations about Defendant MacArthur. The facts alleged in the complaint, when taken as true, present a submissible case for the theory of fraudulent concealment.

## Issue VI

### WHETHER THE COMPLAINT STATES A CAUSE OF ACTION AGAINST BISHOP CARLSON AND THE ROMAN CATHOLIC BISHOP FOR THE ARCHDIOCESE OF MILWAUKEE?

At the hearing on this motion, the Court indicated its intention to dismiss Bishop Carlson and the Roman Catholic Bishop for the Archdiocese of Milwaukee from this lawsuit and Plaintiff's counsel agreed to the dismissal. Based on this agreement, as well as this Court's examination of the complaint, Defendants Bishop Carlson and the Roman Catholic Bishop for the Archdiocese of Milwaukee will be dismissed from this lawsuit.[7] No claim was stated against either of these Defendants. Thus,

IT IS ORDERED:

1. That Defendant Bishop Carlson's Motion to Dismiss, Doc. 12, is granted;

2. That Defendants Diocese of Sioux Falls and Father Dudley's Motion to Dismiss Claims as Time Barred, Doc. 14, is denied;

3. That Defendant Bruce MacArthur's Motion to Dismiss Plaintiff's Claims as Time–Barred, Doc. 19, is denied;

4. That the Motion to Dismiss Complaint by the Archdiocese of Milwaukee and the Roman Catholic Bishop for the Archdiocese of Milwaukee, Doc. 22, is denied with respect to the Archdiocese of Milwaukee and granted with respect to the Roman Catholic Bishop for the Archdiocese of Milwaukee; and

5. That the Motion to Strike Plaintiff's Supplemental Brief, Doc. 37, is denied.

---

7. Bishop Robert Carlson submitted a separate motion and supporting brief for dismissal for failure to state a claim. At the motions hearing, counsel for Father Dudley argued that Father Dudley should be dismissed from this action because his involvement with MacArthur occurred after the sexual abuse of Plaintiff had ended. This position was not raised in a written motion to dismiss, so Plaintiff had no opportunity to respond in advance of oral argument. Accordingly, the dismissal of Bishop Dudley from this lawsuit is not now properly before this Court.